# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

                Plaintiff,

v.

EZRA HALLOCK,

                Defendant.

2:06-cr-00396-JCM-LRL

MOTION TO SUPPRESS (#55)

# REPORT & RECOMMENDATION

      The defendant, Ezra Hallock, Jr. ("Hallock"), is under indictment on one count of Receipt of Child Pornography, a violation of 18 U.S.C. § 2252A(a)(2), and one count of Possession of Child Pornography, a violation of 18 U.S.C. § 2252A(a)(5)(B).  The matter before the court is Hallock's Motion to Suppress (#55), in which he seeks an order suppressing as evidence the oral statements he made to law enforcement personnel while his house was being searched.  Notwithstanding that he was not under formal arrest and that he was in or near his own home at all relevant times during the interrogation, Hallock contends that the interrogation was custodial in nature within the meaning of *Miranda v. Arizona*, 384 U.S. 436 (1966).  He therefore contends that the failure of his interrogators to advise him of his *Miranda* rights rendered his statements inadmissible.  The government filed a Response (#56).  Hallock did not file a reply.

      An evidentiary hearing was conducted on January 20, 2009.  At the hearing, Assistant Special Agent in Charge Richard S. Curry ("ASAC Curry") of United States Immigration and Customs Enforcement ("ICE") testified for the government.  Hallock testified in his own behalf, and called ICE Special Agent Laura Hodgdon ("SA Hodgdon") as a witness for the defense.  Having considered the motion, the opposition, and the testimony and other evidence offered at the evidentiary hearing, the

undersigned submits this Report and Recommendation.

**THE FACTS**

The court finds that the following facts have been established by a preponderance of the evidence. On Tuesday, October 10, 2006, ICE agents executed a search warrant at Hallock's residence, located at 5417 Redview Court, North Las Vegas, Nevada.  The agents obtained the search warrant based on information regarding the alleged transmission and receipt of child pornography images through the Internet.  The residence is a one-story, three-bedroom house of approximately 1,800 square feet.  Surveillance was established just before 6 a.m.  The agents had information that there was a child inside the residence, that a weapon was registered to the residence, and that Hallock was a convicted felon.  They therefore wished to wait until the child vacated the residence before executing the warrant.  Surveillance observed an adult female and a young child exit the residence, enter a vehicle, and drive away.  Two agents stopped the vehicle about one mile from the residence at 6:20 a.m.  They determined the female to be Lauren Hallock, the wife of Ezra Hallock, and the child to be her five-year-old son.  At the time she was stopped, Mrs. Hallock was taking the child somewhere on her way to work.

The agents told Mrs. Hallock they had a search warrant for her residence.  Mrs. Hallock agreed to wait near, but out of sight of, the residence while the search was conducted.  She also confirmed the agents' suspicion that there was a weapon inside the house, and told them where it was.  Mrs. Hallock also told the agents that Hallock was alone in the house.  This information was relayed to the ICE search team.  The interview of Mrs. Hallock was concluded at approximately 6:30 a.m.

At 6:30 a.m., or shortly thereafter, ICE utilized three uniformed North Las Vegas Police Department ("NLVPD") officers to knock on the front door of the residence.  The officers had guns drawn for their safety, but the guns were not pointed towards the front door.  Nine ICE agents were present in the immediate vicinity of the residence, while two stayed with Mrs. Hallock.  Hallock, who was wearing shorts and a tank top, opened the front door.  He looked through the separate storm door, which partially obstructed his view, and saw an armed person in a dark colored uniform standing on his front porch.  The individual told Hallock that he had received a 911 emergency call and needed to enter

2

the residence.  Hallock looked at his Brink's Home Security alarm system to see if it had detected an intrusion.  Brink's sends armed personnel to the site of an intrusion, so Hallock, whose vision was also obscured by the darkness of the hour (the sun had not yet risen), believed that the individual on his porch was a Brink's security guard responding to an alarm.

Although he saw that the alarm system had not been triggered, Hallock opened the storm door. The three NLVPD officers, according to ASAC Curry's testimony, immediately took Hallock "into custody."  The officers handcuffed Hallock behind his back, escorted him to a marked NLVPD patrol car parked in front of his house, and placed him in the rear seat.  Two of the NLVPD officers sat in the front seat.  SA Hodgdon approached the car and provided Hallock with a copy of the search warrant. She explained to him that the agents were there to search his residence.  After SA Hodgdon left Hallock, the rear doors of the patrol car were closed and locked from the outside, thus preventing Hallock from exiting the vehicle.  Hallock asked the officers who were in the car with him whether he could call his wife.  His request was refused.  The officers did not question Hallock, or otherwise try to engage him in conversation.

Immediately after the NLVPD officers removed Hallock from the residence, ICE agents entered and proceeded with the search.  The agents wore badges, bullet-proof vests and/or raid jackets with the word "POLICE" on the front and/or back.  They entered the house with guns drawn.  The agents cleared all rooms and closets, finding no one else in the house.  They found a handgun and secured it.  It took approximately six minutes to secure the house, after which the agents removed their bullet-proof vests and holstered their weapons.  This was common practice before beginning the second phase of such an operation, *i.e.*, searching the premises and gathering evidence.  Vests remained off and weapons holstered for the duration of the warrant's execution.

From approximately 6:35 a.m. to 7:15 a.m., ASAC Curry and SA Hodgdon interviewed Mrs. Hallock at the location where she had agreed to wait during the search.  The agents returned to the residence at 7:32 a.m. and removed Hallock from the NLVPD patrol car, in which he had been confined for the past hour.  They escorted him back into the house, where they removed the handcuffs and told

3

him they wished to talk to him about his alleged involvement with child pornography.  They said, "It's up to you.  We'd like to talk to you, but you don't have to."  They also told him he was not under arrest and would not be arrested that day.  They told him he was free to leave, but if he left, he would not be able to reenter the house until the agents had left.  Hallock indicated he was agreeable to speaking with them.  The agents did not give him his *Miranda* warnings.

ASAC Curry and SA Hodgdon sat Hallock down at a small table in the kitchen area.  One of the agents stood in the kitchen area near a wall, and the other sat at the kitchen table with Hallock.  The table was near a sliding glass door that led to the backyard.  Hallock could see armed ICE agents searching his home.  A computer forensic examiner and an evidence custodian were also present during the search.  After about one minute, ASAC Curry and SA Hodgdon concluded it was too noisy and distracting in that area, and told Hallock they'd like to talk outside where it was quieter.  Hallock did not oppose the idea.  At the hearing, Hallock testified he had nothing to hide and wanted to tell the agents his side of the story.

The agents escorted Hallock out the front door and through the front yard approximately thirty feet to SA Hodgdon's Chevrolet Suburban SUV, which was parked in the street in front of Hallock's house.  One agent walked behind Hallock, the other in front of him.  ASAC Curry sensed that Hallock was "extremely nervous" and potentially violent, so the agents sat on either side of Hallock on the rear seat of the SUV.  ASAC Curry sat to the right of Hallock, his weapon holstered on his right side.  SA Hodgdon sat to Hallock's left, her weapon holstered on her left side.  The doors to the SUV were closed behind them.

Inside the SUV the agents continued their interview of Hallock.  ASAC Curry took the lead in conducting the interview.  He began by reiterating that agents were at Hallock's home in response to allegations of child pornography.  ASAC Curry explained to Hallock that transmissions and subsequent views of child pornography continue to hurt the child involved after the pictures themselves are taken.  The agents also alluded to Hallock's conviction in Idaho for sexual abuse of a minor (*viz.*, Hallock's nine-year old stepdaughter),  and sought assurances that Mrs. Hallock's five-year old son had not been

4

similarly abused by Hallock.  *See* Indictment (#1) at 2.  The only other reference to Mrs. Hallock during the interview came when ASAC Curry asked Hallock if his wife had access to his computer(s).  The agents did not threaten to take action against Mrs. Hallock.

Hallock told the agents that nobody had ever explained the consequences of child exploitation to him as they just had, and said "now I get it."  Once Hallock calmed down, the agents questioned him regarding the child pornography allegations.  They advised him they had intercepted an Internet chat log in which he solicited images of "little girls."  They asked him if he used the Google Hello screen name "camguyalone."  Hallock said he did, and admitted using Google Hello and Yahoo! to chat on the Internet.  Hallock said he preferred to use Google Hello to trade photographs, that he frequently exchanged photographs of "age-appropriate pornography," and that he liked "young, age-appropriate women" and "butts."  He also confirmed that his e-mail address was cam_guy_alone@yahoo.com.  Hallock also said all the computers in the residence were his, and all files on the computers belonged to him.

While ASAC Curry and SA Hodgdon were interviewing Hallock, the computer forensic examiner conducted a preview of Hallock's laptop computer and found eighteen "Lolita" series video files containing child pornography.  The files had been renamed and moved to a file location where they would not be easily discovered.  The computer forensic examiner subsequently approached the SUV and asked ASAC Curry and SA Hodgdon to speak with him outside.  When the agents exited the SUV, they left a door partially open.  Hallock remained in the SUV by himself.  The computer forensic examiner told the agents what he had found.  Hallock overheard him say that "he had found what he was looking for."

Curry and Hodgdon reentered the SUV and explained to Hallock what had been discovered on his computer.  Hallock said that if anything of that nature was found, "it was a mistake."  He explained that he had operated a computer repair company which had gone out of business, and that any illicit files found on his laptop must have been accidentally transferred from a computer he was trying to fix.  When asked again about the chat log, Hallock did not answer.

After about two hours in the SUV the agents concluded that Hallock was not going to make any express admissions regarding his involvement with child pornography, so they terminated the interview. They told Hallock he could go back inside his home and remain there.  As the three were getting out of the SUV, ASAC Curry suggested to Hallock that he seek therapy for his "problems."  Hallock responded somewhat ambiguously, "I know you will be back for me."  The agents asked Hallock what made him say that, and he stated, "Because of what [the computer forensic examiner] just told you."

The search of Hallock's residence lasted approximately five hours.  Hallock was not arrested that day.  On October 11, 2006, a computer forensic agent conducted an analysis of Hallock's computers and computer media.  The analysis revealed more than 600 images (including movie files) of child pornography.  On December 13, 2006 Hallock was indicted in this case, and was arrested on December 17 or 18, 2006.  *See* Indictment (#1).

The deadline for filing motions in this case was July 5, 2007.  Hallock bases his Motion (#55) on *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), which wasn't decided until August 21, 2008.  Although Hallock did not file his Motion (#55) until November 1, 2008, more than two months after *Craighead* was decided, the government does not ask the court to deny it because it wasn't filed timely.  Opp'n (#56) at 4.  The government asks the court to deny it on its merits.  *Id.*

## DISCUSSION

Hallock argues that *Craighead* constitutes an intervening change in the law under which his statements must be deemed to have been made while he was "in custody" for *Miranda* purposes.  The government counters that Hallock was not in custody because law enforcement did not create a "police-dominated atmosphere" designed to intimidate and coerce admissions from him.  *Miranda*, 384 U.S. at 445.[1]

In *Craighead*, the Ninth Circuit considered whether the defendant was "in custody" when he

---

[1] On or about November 3, 2008, the U.S. Attorney's Office for the District of Arizona requested a rehearing in the *Craighead* case, on the ground, among others, that the appellate panel employed a standard for determining whether the defendant was in custody that purportedly is contrary to Supreme Court and Ninth Circuit precedent.  *See* Opp'n (#56) at 1 n.1.  The petition for rehearing is pending.

made certain statements to law enforcement officers during a search of his home and whether *Miranda* warnings were therefore required.  The court began its analysis by reiterating that a suspect who has not formally been taken into police custody may nevertheless be considered "in custody" for purposes of *Miranda* "if the suspect has been 'deprived of his freedom of action in any significant way.'" *Craighead*, 539 F.3d at 1082 (quoting *Miranda*, 384 U.S. at 444).  To determine whether a suspect is in custody, the court noted that courts must examine the "totality of the circumstances surrounding the interrogation," asking "whether a reasonable person in those circumstances would 'have felt he or she was not at liberty to terminate the interrogation and leave.'" *Craighead*, 539 F.3d at 1082 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

The court applied these general principles to an interrogation conducted inside the suspect's own home, and noted that under certain circumstances such an interrogation may be found to be custodial.  *Id.* at 1083.  The court recognized that an in-home interrogation presents some analytical challenges because, even if a suspect is told he is free to leave the home, he may not have anywhere else to go.  *Id.*  The court also noted that a reasonable person interrogated within his own home may have a different understanding of whether he is actually free to terminate the interrogation.  *Id.*  At the same time, a reasonable person interrogated in his own home may suffer less compulsion given the familiar surroundings.  *Id.*  In other words, a person who feels that he has nowhere else to go may also feel freer to assert his rights in the home.

The court therefore focused on "the extent to which the circumstances of the interrogation turned otherwise comfortable and familiar surroundings of the home into a 'police dominated atmosphere.'" *Id.* (quoting *Miranda*, 384 U.S. at 445).  The court observed that such an analysis "is necessarily fact intensive," *id.* at 1084 (quoting *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)), and noted that the following factors should be considered:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such

statements were made.

*id.*

In contrast to *Craighead*, the facts of the case at bar do not present the same analytical challenges associated with an interrogation that takes place in the "comfortable and familiar surroundings" of one's own home.  539 F.3d at 1083.  Here, the critical time for the purpose of this court's inquiry is the two-hour period during which Hallock was interviewed inside SA Hodgdon's SUV, not the period of one minute inside Hallock's residence when the interviewing agents determined that the surroundings were too distracting for a proper interview.  The government does not contend that Hallock made any statements of moment during that one-minute period.  Hence, the analytical framework developed in *Craighead* for in-home interrogations is not entirely applicable here.  Rather, the court's determination of whether Hallock was "in custody" within the meaning of *Miranda* must be made with an eye to the unique facts of this case.  The following factors are among those likely to be relevant in this analysis: "the language used by the officers, the physical characteristics of the place where the questioning occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt."  *United States v. Hernandez*, 476 F.3d 791, 796 (9th Cir. 2007) (quoting *United States v. Butler*, 249 F.3d 1094, 1099 (9th Cir. 2001)); *accord United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (citing *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987)).  These factors are not exhaustive.  *United States v. Kim*, 292 F.3d 969, 974 (2002).

Hallock's first contact with law enforcement was in the darkness of an early October morning when, upon opening his storm door to speak with what he thought was a Brink's Home Security professional, he was confronted by three armed NLVPD officers with guns drawn.  The officers immediately restrained him, handcuffed him behind his back, and escorted him past nine armed ICE agents in full raid gear into the rear seat of a marked NLVPD patrol car parked in front of his house.  Hallock was clad only in shorts and a tank top.  He was told the agents had a warrant and were there to search his home.  He was not permitted to put on more clothing. The rear doors of the patrol car were

8

locked from the outside.  He asked the two NLVPD officers sitting in the front seat of the vehicle for permission to contact his wife, but he was refused.  Hallock was frightened and upset.  For all practical purposes, he was under arrest in the back seat of a locked police car.  This was the atmosphere preceding the interview that was to follow.

About an hour later ASAC Curry and SA Hodgdon removed Hallock from the NLVPD patrol car.  ASAC Curry told him he was not under arrest and would not be arrested that day.  ASAC Curry also told Hallock he was free to go, but if he decided to leave, he would not be allowed to reenter the residence until the agents had departed.  The fact that ASAC Curry made these statements weighs against a finding of custody.  *See Craighead*, 539 F.3d at 1087 ("If a law enforcement officer informs the suspect that he is not under arrest, . . . and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody.") (citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)).

On the other hand, "[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial *per se*.  We must consider the delivery of these statements within the context of the scene as a whole."  *Craighead*, 539 F.3d at 1088 (citing *United States v. Lee*, 699 F.2d 466, 467-68 (9th Cir. 1982) (per curiam) (holding an interrogation was custodial even though the interrogating FBI agents told the suspect that he was free to leave or terminate the interview at any time because the suspect was questioned in a closed FBI car for over an hour while police investigators searched the house)).  "The *Miranda* test for custody does not ask whether the suspect was *told* that he was free to leave; the test asks whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Craighead*, 539 F.3d at 1088 (emphasis in original) (quoting *Thompson*, 516 U.S. at 112).

Hallock was virtually under guard throughout the three-hour period from when the agents knocked on his front door until the two-hour interrogation was concluded.  For the first hour he was handcuffed in the back of a patrol car.  Then armed federal agents escorted him to his house, where they removed the cuffs and attempted to interview him.  Because several other armed agents on the search

team were making too much noise, the interviewing agents immediately escorted Hallock to a nearby SUV, in the back seat of which Hallock was sandwiched between two agents, who interrogated him almost uninterruptedly for two hours.  A reasonable person in Hallock's position would not have "felt" free to leave.  *Thompson*, 516 U.S. at 112; *see also Griffin*, 922 F.2d at 1350-51 ("[T]he likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest.").  That Hallock wanted to talk to the agents is not constitutionally relevant.  The issue here is not whether his statements were voluntary.  The issue is whether the authorities were required to advise Hallock of his *Miranda* rights. It is undisputed that he was not advised of his right to counsel, and of his right to postpone questioning until counsel could be present.  Nor had he been advised that anything he said could be used against him.

Due to the large number of law enforcement personnel in and around his home, Hallock could have reasonably believed that, should he have attempted to leave the vicinity, he would have been stopped by one of the several officers he would have encountered on the way.  *See Craighead*, 539 F.3d at 1084-85 ("[W]hen the number of law enforcement personnel far outnumber the suspect, the suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out. . . . [T]he presence of a large number of visibly armed law enforcement officers goes a long way towards contributing to a 'police-dominated atmosphere.'") (citing *Sprosty v. Buchler*, 79 F.3d 635, 638, 642 (7th Cir. 1996) (five officers, one of whom was visibly armed and in uniform, surrounded the suspect in two police cars)) (other citations omitted).  Hallock may have also believed that the large number of law enforcement personnel was brought to prevent his departure.  *See Craighead*, 539 F.3d at 1085.

In sum, this was a confrontation with law enforcement officers which began with a show of force and was followed by isolation from family and close monitoring by armed agents.  The coercive nature of the confrontation created a custodial atmosphere that was not easily undone by the agents' statements that Hallock would not be arrested that day and was free to go.  The court finds that under

10

the totality of these circumstances, the atmosphere was sufficiently police dominated that the *Miranda* warnings were required.  Because the *Miranda* warnings were not given, Hallock's statements must be suppressed.

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Hallock's Motion to Suppress (#55) should be granted.

DATED this 9th day of March, 2009.

_____

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**

11